| **Berkowitz v City of New York** |
|:---:|
| 2026 NY Slip Op 30668(U) |
| February 24, 2026 |
| Supreme Court, New York County |
| Docket Number: Index No. 159714/2018 |
| Judge: James G. Clynes |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | | |
|---|---|---|
| **PRESENT:** HON. JAMES G. CLYNES | **PART** | **39M** |
| *Justice* | | |

-----------------------------------------------------------------------X

MARK BERKOWITZ,

                Plaintiff,

        - v -

CITY OF NEW YORK, NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION and GANSEVOORT
MARKET INC.,

                Defendants.

-----------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 159714/2018 |
| **MOTION DATE** | 03/27/2023, 03/28/2023, 03/28/2023 |
| **MOTION SEQ. NO.** | 005 006 007 |

### DECISION + ORDER ON MOTION

GAINSEVOORT MARKET INC.,

                Third-Party Plaintiff,

        -against-

U.S. WATER SERVICES, INC.,

                Third-Party Defendant.

-----------------------------------------------------------------------X

Third-Party
Index No. 595197/2019

THE CITY OF NEW YORK and NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,

                Third Third-Party Plaintiffs,

        -against-

CHEMICAL SPECIFICS, INC.,

                Third Third-Party Defendant.

-----------------------------------------------------------------------X

Third Third-Party
Index No. 596019/2019

GAINSEVOORT MARKET INC.,

                Fourth Third-Party Plaintiff,

        -against-

CHEMICAL SPECIFICS, INC.,

                Fourth Third-Party Defendant.

-----------------------------------------------------------------------X

Fourth Third-Party
Index No. 595186/2020

159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK
Motion No. 005 006 007

Page 1 of 26

[* 1]

The following e-filed documents, listed by NYSCEF document number (Motion 005) 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 206, 208, 218, 223, 226, 227, 228, 229, 237, 238, 247, 248, 249, 250, 251

were read on this motion to/for _____ JUDGMENT - SUMMARY _____.

The following e-filed documents, listed by NYSCEF document number (Motion 006) 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 209, 211, 212, 213, 214, 215, 219, 224, 235

were read on this motion to/for _____ JUDGMENT - SUMMARY _____.

The following e-filed documents, listed by NYSCEF document number (Motion 007) 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 201, 202, 203, 204, 210, 220, 225, 230, 231, 232, 233, 244, 245, 246, 252, 253, 254

were read on this motion to/for _____ JUDGMENT - SUMMARY _____.

Motion sequence nos. 005, 006 and 007 are consolidated for disposition.

Plaintiff Mark Berkowitz ("plaintiff") commenced this action to recover damages for personal injury against defendants/third third-party plaintiffs the City of New York ("the City") and New York City Economic Development Corporation ("Economic Development") (together "City defendants"), and defendant/third party plaintiff Gansevoort Market Inc. ("Gansevoort Market"), alleging that he sustained injuries on April 26, 2018 while cleaning a cooling tower at 820-826 Washington Street, New York, New York. Plaintiff alleges that the City defendants and Gansevoort Market's actions were in violation of Labor Law 200, 240 (1), and 241 (6).

The City defendants move, pursuant to CPLR 3212, for summary judgment (motion sequence no. 005) to dismiss plaintiff's claims and all cross-claims asserted against them or alternatively for an award of contractual indemnity against Gansevoort Market. Gansevoort Market also moves for summary judgment pursuant to CPLR 3212 (motion sequence no. 007) dismissing plaintiff's complaint and all cross-claims/counterclaims asserted against it. In the alternative, Gansevoort Market moves for contractual indemnity against U.S. Water Services Inc. ("US Water") and Chemical Specifics Inc. ("Chemical Specifics"). Finally, plaintiff moves for

**159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK**                          **Page 2 of 26**
**Motion No. 005 006 007**

summary judgment pursuant to CPLR 3212 (motion sequence no. 006) on liability against the City defendants and Gansevoort Market.

For the reasons below, the court denies plaintiff's motion for summary judgment and grants the City defendants and Gansevoort Market's motions for summary judgment. Plaintiff's claims against the City defendants and Gansevoort Market are thus dismissed, and all cross-claims against these defendants are also dismissed.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. The Incident

On October 15, 2018, during his General Municipal Law 50-h hearing, plaintiff testified that he was employed by Chemical Specifics as a mechanic for over 30 years (NYSCEF Doc No. 143, Marchese affirmation, exhibit t, plaintiff's 50-h hearing tr, p. 6). His duties as a mechanic included cleaning, repairing and inspecting cooling towers (*id.*).

Plaintiff testified that on April 26, 2018, at approximately 11:30 am, he had a work-related accident on Washington Street in Manhattan (*id.* at pp. 11-13). Plaintiff explained that US Water subcontracted Chemical Specifics to clean, inspect and repair a cooling tower owned by Gansevoort Market, for which plaintiff was assigned to perform (*id.* at pp. 13, 29-31). Plaintiff went to the location with his coworker Mike, who witnessed the accident (*id.* at pp. 13-14).

Plaintiff testified that at the location, two men shut down the cooling tower so he and Mike could clean it, and a male employee instructed him on what needed to be cleaned (*id.* at pp. 16, 31, 41). To perform the cleaning, plaintiff used his tools: a pressure washer, a gas can, a gallon of gasoline, a toolbox, a wet vacuum, extension cords, hoses, and ropes (*id.* at pp. 15-16, 27).

Plaintiff explained that he had to get to the top of the cooling tower to perform the job (*id.* at pp. 17-19). He first climbed up to the first level of the cooling tower, a metal flat platform, by

[* 3]

using an A-frame ladder that was already set up by the cooling tower (*id.* at pp. 18-19). Plaintiff then used his own sectional ladder, provided by his employer, to continue going up the tower (*id.* at p. 19). Plaintiff testified that his sectional ladder had two sections with six rungs per section and rubber pieces at the bottom to prevent slipping, and it was not defective on the day of the accident (*id.* at pp. 25, 28). Plaintiff set up his sectional ladder on the metal flat platform, located off the top of the A-frame ladder, against the cooling tower (*id.* at p. 19). He could not secure his sectional ladder with his ropes because there was nothing in the cooling tower to tie it to (*id.* at pp. 24, 27).

Plaintiff testified that he climbed the ladder to the top of the tower and removed the "wing nuts" and the panel (*id.* at p. 19). Plaintiff also removed the eliminators from the tower, located approximately 25 feet high from the ground, and handed them down to Mike, who was standing on the metal platform off the top of the A-frame ladder (*id.* at pp. 17, 20). The eliminators were six feet long and plaintiff lowered them down to Mike, who power washed them (*id.* at pp. 20-21). While Mike power washed the eliminators, plaintiff was inside the cooling tower power washing the interior to prevent Legionnaire's disease (*id.* at pp. 17, 20-21). Plaintiff reattached a metal pipe that fell while cleaning the cooling tower (*id.* at pp. 16-17).

Subsequently, plaintiff testified that he went down his ladder and Mike handed him the power washed eliminators from the ground (*id.* at p. 21). Mike then went up the A-frame ladder to the metal platform and plaintiff went into the cooling tower, and Mike handed the eliminators to plaintiff to put them back (*id.* at p. 22). Plaintiff testified that he then climbed on his ladder and asked Mike to hand him the panel/access door so he could put it back (*id.* at pp. 22-23). As Mike was handing plaintiff the access door, weighing approximately 60 pounds, and as plaintiff was attempting to get it, the sectional ladder slipped from underneath and plaintiff fell (*id.* at pp. 22-

**159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK**
**Motion No. 005 006 007**

23, 27-28). Plaintiff explained that on his way down, his lower back struck the metal flat platform and he fell all the way to the ground, on the concrete (*id.* at pp. 46-47).

Plaintiff testified that the fall caused him to suffer injuries to the head, neck, back, shoulder and one side of his body (*id.* at pp. 47-49). He was taken to Bellevue Hospital on the day of the accident and continued to get treatment for his injuries (*id.* at pp. 50, 53-67).

Plaintiff explained that on the day of the accident, he did not observe any scaffolding hoists, stay ladders, slings, hanger blocks, pulley braces or ropes while cleaning the cooling tower, and he did not believe that the building was undergoing any kind of erection, demolition or repair or alteration (*id.* at p. 43).

On June 18, 2021, approximately three years after the accident, plaintiff was deposed for this case (NYSCEF Doc No. 144, Marchese affirmation, exhibit u, plaintiff's tr). He testified that at the time of the accident, he worked as a mechanic for Chemical Specifics and his responsibilities included cleaning cooling towers and making repairs if necessary (*id.* at pp. 14-15). Plaintiff testified that cleaning cooling towers is done on a periodic and regular basis to prevent Legionnaire's disease (*id.* at p. 124).

Plaintiff testified that on April 26, 2018, his employer scheduled and directed him to clean a cooling tower located at 820-826 Washington Street, Manhattan (*id.* at p. 23). Plaintiff explained that US Water retained his employer for the job, and his employer issued a work order to clean the cooling tower and replace any spray nozzles if necessary (*id.* at pp. 23-26). Plaintiff emphasized, however, that he did not speak with any US Water representative on how to do the cleaning on the day of the accident (*id.* at pp. 141, 153). Similarly, no City representative advised plaintiff on how to clean the cooling tower (*id.* at pp. 119).

159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK
Motion No. 005 006 007

Page 5 of 26

5 of 26

Plaintiff explained that he went to the location with his coworker, Mike Correa, who was to assist with carrying equipment and with other tasks (*id.* at p. 27). Plaintiff testified that he needed specific tools for cleaning the cooling tower, including a wet vac, a wet vacuum, extension cords, a tool bag, and a four sectional ladder (*id.* at pp. 28, 30, 125). These tools were provided by Chemical Specifics (*id.* at p. 30). Plaintiff described the sectional ladder to have five to six feet long sections, each containing five to six rungs, and the base of the ladder to have rubber soles on the bottom (*id.* at pp. 31, 35). Plaintiff testified that he inspected the ladder prior to using it on the day of the accident, and there was "nothing functionally wrong with" it (*id.* at p. 34; *see also id.* at pp. 32, 36). Plaintiff also did not have any issues with the rubber soles on the bottom of his sectional ladder prior to the incident (*id.* at p. 35). Plaintiff did not request a harness or a scaffold and only used his own equipment/tools (*id.* at pp. 37, 42).

Plaintiff testified that when he got to the location of the cooling tower, two men shut down the cooling tower so him and Mike could clean it (*id.* at p. 39). He spoke to the men briefly, who reminded him to clean the spray nozzles and replace them if needed (*id.* at pp. 40, 189). Plaintiff went back to his truck to get his equipment, including a power washer and his sectional ladder (*id.* at p. 42). Plaintiff explained that there was no construction at the location at that time (*id.* at pp. 41, 141).

Plaintiff testified that he went up an A-frame ladder, which was already set up, to get to a flat metal platform (*id.* at pp. 43-44, 135). On that platform, plaintiff set up his sectional ladder but could not secure it because there was nothing to tie it to (*id.* at pp. 65, 147). Plaintiff testified that he only went up the tower where the eliminators are, which is about 20 feet from the ground (*id.* at pp. 44-45).

[* 6]

Specifically, plaintiff testified that he first went up the sectional ladder, removed the heavy hatch and handed it over to Mike (*id.* at p. 57). Plaintiff also handed Mike the nuts and bolts (*id.* at p. 58). Plaintiff then climbed inside the cooling tower and stood on the steel pipes (*id.* at pp. 59, 61). Plaintiff used the power washer to clean the inside of the tower, specifically the top of the cooling tower, the eliminators, and all the nozzles (*id.* at pp. 60, 181). While cleaning, a metal rod fell, and he reattached it (*id.* at pp. 59-60, 187). Plaintiff also replaced/changed "a couple" of missing nozzles (*id.* at pp. 60-61, 187).

Plaintiff further testified that he put back the eliminators, lowered down the pressure washer to Mike, and then went down the ladder to get the access door/hatch from Mike so he could put it back (*id.* at pp. 61-62). As Mike, standing on the metal platform, was getting the hatch to hand to plaintiff, the sectional ladder that plaintiff was on slipped from the bottom and plaintiff fell (*id.* at pp. 61-63). Plaintiff testified that Mike did not tell him not to use his sectional ladder because it was unsafe (*id.* at p. 136). Plaintiff also testified that he noticed a little bit of water accumulation on the platform during the cleaning (*id.* at p. 183).

Plaintiff testified that as he fell, his body, specifically his hands, shoulders, back, legs, and head, hit the metal platform and then the asphalt ground (*id.* at pp. 67-68). Plaintiff explained that he lost consciousness briefly (*id.* at p. 68). The ambulance was called, and plaintiff was taken to Bellevue Hospital (*id.* at p. 70). Plaintiff then saw other doctors, had lower back and right shoulder surgeries, and received physical therapy (*id.* at pp. 81-82, 90, 98). Plaintiff testified that he continues to have pain on his shoulder, neck, and head (*id.* at pp. 99, 103). Plaintiff, however, testified that he did not seek treatment with a therapist or a psychiatrist (*id.* at p. 102).

Richard R. Walsh ("Walsh"), a refrigeration mechanic employed by Hallam Engineering and Construction Corp. ("Hallam"), testified that he has 19 years of experience and was present at the

**159714/2018   BERKOWITZ, MARK vs. CITY OF NEW YORK**          **Page 7 of 26**
**Motion No. 005 006 007**

7 of 26

[* 7]

job site at Gansevoort Market on April 26, 2018 (NYSCEF Doc No. 122, Marchese affirmation, exhibit aa, Walsh tr, pp. 13, 31)[1]. He was there with a coworker to "shut down the mechanical/engine room" and drain the water from the cooling tower so the US Water workers could clean the cooling tower (*id.* at pp. 14-15, 24, 76). Walsh testified it was not raining, and it was not windy that day (*id.* at p. 70).

Walsh described the cooling tower to have a galvanized catwalk, about five feet off the ground, that is made accessible by five steps leading to the catwalk (*id.* at p. 39). To get to the top of the cooling tower, one must climb approximately six to eight feet from the catwalk, using a ladder, onto another landing of the cooling tower (*id.* at pp. 26-27). Once on that landing, Walsh explained one would need approximately a six-foot ladder to get to the upper part of the cooling tower to access the manhole covers and take the eliminators out to conduct the cleaning work (*id.*). Wash explained that the cooling tower is located three to four feet from the engine room (*id.* at p. 53).

Walsh further explained that after they shut down the engine room, two workers showed up, the older one being plaintiff (*id.* at pp. 45-46). Walsh testified that plaintiff and his coworker brought with them a pressure washer, a shop-vac and one section of a sectional ladder (*id.* at pp. 35-36). Walsh believed plaintiff was using a single section of a sectional ladder because of the way it looked (*id.* at pp. 17, 42-44).

Walsh explained the sequence of events and emphasized that he did not see plaintiff go up the catwalk or up the ladder initially because Walsh and his partner were inside the engine room (*id.* at pp. 45, 47-48, 49-50). Walsh and his partner then went outside to see if plaintiff and his coworker needed help (*id.* at p. 54). It was then that Walsh saw plaintiff on the upper landing of the cooling tower placing his sectional ladder against the highest level of the cooling tower (*id.* at pp. 47-48,

---

[1] Because Mr. Walsh's deposition transcript does not appear to have the pages numbered, the court will refer to pages from 1 out of 107, counting the exhibit page.

**159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK**          **Page 8 of 26**
**Motion No.  005 006 007**

55). Specifically, the bottom of plaintiff's ladder was on the upper landing and the rest of the ladder was leaning against the cooling tower (*id.* at p. 55). Walsh testified that plaintiff's coworker was on the ground level at that time (*id.* at pp. 54-55).

Walsh testified that he then saw plaintiff on the first rung of the ladder (*id.* at p. 56). At that point, Walsh told plaintiff that the ladder he was using did not look safe and offered him an A-frame ladder, made from fiberglass that had rubber feet on the bottom, from inside the engine room (*id.* at pp. 16, 36, 56). Walsh believed the ladder plaintiff was using was not safe because it did not have rubber feet to grip the metal on the bottom of the ladder (*id.* at pp. 79-80). Plaintiff, however, declined Walsh's offer and stated in sum and substance that he only uses his equipment (*id.* at p. 56). Walsh explained that plaintiff's coworker also expressed safety concerns about the ladder, but plaintiff declined to use the ladder in the engine room (*id.* at p. 56). That is when Walsh and his coworker went back to the engine room (*id.*).

Walsh and his partner were inside the engine room close to the door, when they heard some thumps and plaintiff's cries from pain (*id.* at pp. 50-51, 57-58). When they went back outside, they saw plaintiff who had fallen off, approximately eighteen to twenty feet, on the ground (*id.* at pp. 58, 71). Walsh testified that he asked someone to call 911, and the EMT arrived on the scene and placed plaintiff on a stretcher (*id.* at pp. 60-61). Finally, Walsh testified that there were no City defendants' personnel on the scene on the day of the accident (*id.* at p. 73).

John Jobbagy ("Jobbagy") testified that he is the president and a shareholder of Gansevoort Market, which is a cooperative, and has held the same roles during the time of plaintiff's accident (NYSCEF Doc No. 146, Marchese affirmation, exhibit w, Jobbagy tr, pp. 9,11). Gansevoort Market leases one building from the City defendants to house meat companies (*id.* at pp. 10, 12, 50-51). The mailing address of the building is 832 Washington Street, although the legal address

159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK Page 9 of 26
Motion No. 005 006 007

9 of 26

[* 9]

on the lease is different (*id.* at p. 10). Under the lease with the City defendants, Gansevoort Market is responsible for maintaining the premises and the City defendants must be named as additional insured in its insurance policy and be indemnified for personal injury claims on the premises (*id.* at pp. 68-69, 87).

Jobbagy explained in relevant part that Gansevoort Market has a cooling tower in the building's courtyard that releases the heat from Gansevoort Market's refrigeration system (*id.* at pp. 14-15). As Gansevoort Market's president, Jobbagy testified that he is responsible for running the building, including representing Gansevoort Market in its dealings with the City defendants and the property owners, and hiring contractors (*id.* at pp. 11-12).

Jobbagy explained that Gansevoort Market contracted US Water to provide water treatment for its cooling tower and contracted Hallam to maintain the refrigeration system, including the engine room of the cooling tower (*id.* at pp. 13, 53-54, 66-68, 76). US Water was specifically hired to clean the cooling tower, which is mandated by the City approximately twice a year, with different chemicals and biocides to prevent Legionnaire's disease (*id.* at pp. 13-14, 68, 76). Jobbagy testified, however, that Gansevoort Market did not have any contractual relationship with Chemical Specifics, which US Water hired for the cleaning job (*id.* at p. 96).

As to the incident, Jobbagy testified that on April 26, 2018, he was told that someone was injured at the cooling tower (*id.* at pp. 15-16). Jobbagy then saw plaintiff on the floor near the cooling tower and other people surrounding plaintiff (*id.* at pp. 17-18). According to Jobbagy, Andrew Bittner from US Water was present earlier that day to ensure that Chemical Specifics sent people to do the cleaning, but there were no City personnel on site directing or controlling any individual from US Water or Chemical Specifics (*id.* at pp. 29, 71-72).

**159714/2018   BERKOWITZ, MARK vs. CITY OF NEW YORK**
**Motion No. 005 006 007**

**Page 10 of 26**

10 of 26

Jobbagy testified that he spoke to two refrigeration mechanics from Hallam, Mike Longo ("Longo") and Walsh, who were in the engine room when the accident happened (*id.* at pp. 22-23, 27). The refrigeration mechanics provide services for Gansevoort Market whenever the refrigeration machinery and the cooling tower need service (*id.* at pp. 27-28). Through Longo, Jobbagy found out how the accident happened but admitted that Logo did not see the actual fall (*id.* at pp. 23-24).

Jobbagy emphasized that before plaintiff's accident, there were no other accidents or complaints related to the cooling tower or its structure (*id.* at pp. 46, 47-48). Gansevoort Market was not issued any structurally related violations or citations from the state or any local municipality regarding the cooling tower (*id.* at p. 73). Jobbagy confirmed that no repairs or alterations were being made on the cooling tower on the day of the accident (*id.* at p. 72). Additionally, the twice-a-year mandated cleaning was not part of any ongoing project or construction on the premises (*id.* at pp. 72, 75). Further, Jobbagy explained that the City defendants and Gansevoort Market did not provide any materials or equipment to plaintiff for the cleaning of the cooling tower on the day of the accident (*id.* at p. 76).

Andrew Bittner ("Bittner"), a regional manager at Kurita America, testified that in 2018 he was an account manager at US Water, which was then acquired by Kurita America (NYSCEF Doc No. 147, Marchese affirmation, exhibit x, Bittner tr, pp. 11, 112-113). Bittner explained that as an account manager he was responsible for sales and services, checking client's water treatment systems, and providing reports (*id.* at p. 12).

Bittner testified that US Water entered a written contract with Gansevoort Market to provide water treatment services (*id.* at pp. 20-21). US Water would provide routine cleaning services for Gansevoort Market's cooling tower (*id.* at pp. 21-22, 139). US Water would also inspect the

159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK
Motion No. 005 006 007

Page 11 of 26

11 of 26

cooling tower for biological bacteria every ninety days and would test the chemistry once a month (*id.* at pp. 26, 118-120). Bittner testified that he would be the one making the monthly visits where he would go into the mechanical room and check the chemical feed station (*id.* at pp. 26-29). The cleaning of the cooling tower was required twice a year to comply with the NYC Department of Health (*id.* at pp. 120-121). US Water, however, did not perform any maintenance or repair work on the cooling tower, as that was Hallam's responsibility (*id.* at p. 22, 118, 126, 128).

Bittner further testified that on the day of the accident, April 26, 2018, he was at Gansevoort Market in the morning, but he did not see the accident (*id.* at pp. 31, 38). Bittner was there to ensure that Chemical Specifics was on site for the cooling tower cleaning (*id.* at p. 31). US Water had retained Chemical Specifics to clean Gansevoort Market's cooling tower that day as a one-time event because US Water was experiencing limited manpower (*id.* at pp. 24, 27). Bittner initially saw Hallam's mechanics and told them to drain the cooling tower to prepare it for the cleaning crew from Chemical Specifics but testified that he did not discuss ladders or how the Chemical Specifics crew would get up to the cooling tower (*id.* at pp. 34-35, 39). When plaintiff and his helper arrived, Bittner showed them where the cooling tower was located, where the fresh water supply was, and where the electrical outlets were located if needed for the cleaning (*id.* at p. 41). US Water, however, did not provide any materials or equipment to plaintiff or his helper on the date of the accident, as Chemical Specifics provided all the ladders (*id.* at pp. 40, 44). Brittner only told plaintiff and his helper to wear proper PPE, at a minimum gloves and glasses, during the job (*id.* at pp. 53-54).

According to Bittner, US Water was not to supervise or control Chemical Specifics' cleaning (*id.* at pp. 114-115). US Water, nevertheless, had the authority to stop Chemical Specifics' cleaning if it believed that it was being done in an unsafe manner (*id.* at pp. 115-116).

**159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK** **Page 12 of 26**
Motion No. 005 006 007

[* 12]

12 of 26

After Bittner spoke to plaintiff and his helper, Bittner testified that he went to a different location for another client's project (*id.* at p. 48). Later in the day, Bittner received a call about plaintiff's accident (*id.* at p. 56). When Bittner went back to Gansevoort Market's cooling tower, he spoke to Longo about the accident and drafted a summary of what happened (*id.* at pp. 60-61). Bittner explained that he only saw a sectional ladder by the cooling tower and took photographs of it because Mike pointed to it as the ladder that plaintiff used during the accident (*id.* at pp. 61-62, 83). Bittner, however, testified that he did not see an A-frame ladder at any point (*id.* at pp. 93-94).

Carmen Morales ("Morales"), the head of customer service at Chemical Specifics, testified that she was employed by Chemical Specifics at the time of the accident (NYSCEF Doc No. 148, Marchese affirmation, exhibit y, Morales tr, pp. 8-9). Morales testified that Chemical Specifics is an HVAC maintenance company, and her work consists of answering calls, dealing with customers, and scheduling work/project appointments for the workers (*id.* at p. 9).

Morales testified that plaintiff was a mechanic at Chemical Specifics, who was involved in an accident during a job for US Water (*id.* at pp. 10-12, 14-15). Specifically, she explained that US Water hired Chemical Specifics to clean a cooling tower, which plaintiff was assigned to perform (*id.* at pp. 15, 22). Morales emphasized that plaintiff had experience in cleaning cooling towers, so Morales prepared a work order for this specific job, which was given to plaintiff in the morning (*id.* at pp. 25-26, 36). The work order contained information such as the job name, address, customer's information, and anything relevant that the worker might need (*id.* at p. 36). This US Water request, however, did not involve any repairs (*id.* at pp. 29-30).

Morales testified that to clean a cooling tower, equipment such as a pressure washer, vacuum and hand tools are used (*id.* at p. 23). Ladders are also sometimes needed (*id.*). Chemical Specifics

159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK
Motion No. 005 006 007

Page 13 of 26

supplies its workers with the tools they need, including ladders (*id.* at pp. 24, 59). Morales also prepared the invoice regarding plaintiff's job for the day of the accident (*id.* at p. 40).

The Chemical Specific's invoice to US Water states in pertinent part that the cooling tower was thoroughly cleaned and pressure washed in the interior, and the subject cooling tower was left operating (NYSCEF Doc No. 142, Marchese affirmation, exhibit s, Chemical Specifics invoice). There is no mention of repairs (*id.*).

Sean Freas ("Freas"), the Vice President of Asset Management at the New York City Economic Development Corporation, testified and confirmed that the lease documents show that the City defendants are the owners of 820-826 Washington Street, New York, New York and Gansevoort Market is the tenant (NYSCEF Doc No. 145, Marchese affirmation, exhibit v, Freas tr at pp. 17, 22, 29). Freas explained that pursuant to the original lease and amendments, Gansevoort Market is responsible for routine and capital repair, maintenance and operation of the property (*id.* at pp. 25, 32). Freas also testified that Gansevoort Market was the tenant at the time of the accident, and still is the tenant (*id.* at pp. 30 -31).

B. Relevant Contracts

The City defendants entered into a lease agreement with Gansevoort Market in 1974, which was later amended on December 21, 2001, May 19, 2011 and February 16, 2016 (NYSCEF Doc No. 140, Marchese affirmation, exhibit q, city defendants' notice to admit at pp. 2-3).

The lease documents provide in pertinent part that Gansevoort Market, as a lessee, has an obligation:

"To the fullest extent permitted by law . . . [to] indemnify and save Lessor, Administrator and their respective officers, directors, employees, agents and servants (collectively, the 'Indemnitees') harmless from and against any and all liabilities, suits, obligations, fines, damages, penalties, claims, costs, charges, and expenses, including, without limitation, reasonable architects' and attorney's fees and disbursements, that may be imposed upon or incurred by or asserted against any of the Indemnitees by reason of any of the following, except

159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK
Motion No. 005 006 007

Page 14 of 26

[* 14]

that no Indemnitee shall be so indemnified and saved harmless to the extent the liabilities, etc.,
are solely caused by the negligent or intentional tortious acts or omissions of Lessor or their
respective officers, directors, employees, agents and servants . . .

(4) Accidents, Injury to Persons or Property. Any accident, injury (including death at
any time resulting therefrom) or damage to any person or property occurring in, on, or
about the Demised Premises or any part thereof, or in, on, or about any street, plaza,
sidewalk, curb, or space comprising a part thereof"

(NYSCEF Doc No. 140, exhibit b at pp. 9-10)

C.  Procedural Posture

Plaintiff filed this lawsuit against the City defendants and Gansevoort Market on October 19,

2018. Gansevoort Market then filed a third-party complaint against third party defendant US Water

on March 11, 2019. US Water filed a second third-party complaint against second third party

defendant Chemical Specifics on November 7, 2019. The City defendants also filed a third third-

party complaint against third third-party defendant Chemical Specifics on November 20, 2019.

Finally, Gansevoort Market filed a fourth third-party complaint against fourth third-party

defendant Chemical Specifics.

In their answer, the City defendants also asserted cross-claims against Gansevoort Market for

breach of contract for failure to procure insurance, for common law and contractual

indemnification and for contribution.

After the parties exchanged discovery, Chemical Specifics moved for summary judgment to

dismiss all the third-party complaints asserted against it by US Water, the City defendants and

Gansevoort Market (motion sequence no. 003). US Water also moved for summary judgment to

dismiss the third-party complaint filed by Gansevoort Market (motion sequence no. 004). The

court granted both the US Water and Chemical Specifics' motions for summary judgment (*see*

NYSCEF Doc No. 268-269).

**159714/2018   BERKOWITZ, MARK vs. CITY OF NEW YORK**          **Page 15 of 26**
**Motion No.  005 006 007**

15 of 26

Present before the court are the outstanding motions for summary judgment. City defendants move for summary judgment to dismiss plaintiff's complaint and all cross-claims[2] against them, and in the alternative, award the City defendants' contractual indemnity against Gansevoort Market. Gansevoort Market moves for summary judgment dismissing plaintiff's complaint and all cross-claims/counterclaims asserted against it. In the alternative, Gansevoort Market moves for contractual indemnity against US Water and Chemical Specifics. Plaintiff also moves for summary judgment on liability against the City defendants and Gansevoort Market.

## DISCUSSION

A party moving for summary judgment under CPLR 3212 "must make prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). The "facts must be viewed in the light most favorable to the non-moving party" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012] [internal quotation marks and citation omitted]). Once the moving party has met this prima facie burden, the burden shifts to the non-moving party to furnish evidence in admissible form sufficient to raise a material issue of fact (*Alvarez*, 68 NY2d at 324). The moving party's "[f]ailure to make such prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers" (*id.*).

Here, since plaintiff, Gansevoort Market and the City defendants each seek summary judgment, each side bears the burden of making a prima facie showing of entitlement to a judgment as a matter of law tendering sufficient evidence to demonstrate the absence of any material issues of fact. Once the burden is met, the opposing party/parties then must demonstrate the existence of a triable issue of fact.

---

[2] Although the City defendants move to dismiss all cross-claims against them, it does not appear that Gansevoort Market asserted any cross-claims against the City defendants in their answer (*see* NYSCEF Doc No. 5).

**159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK**
**Motion No. 005 006 007**

A. Labor Law 240 (1)

The City defendants move for summary judgment and argue that Labor Law 240 (1) does not apply because plaintiff's cleaning of the cooling tower was *routine*, did not require specialized tools or equipment, and there was no ongoing construction project. The City defendants argue that plaintiff's work is not a protected activity and does not constitute a "repair" under the statute. According to the City defendants, even if the statute applies, plaintiff's actions were the sole proximate cause of the alleged accident because he was warned of the unsafe condition of the sectional ladder and was offered the use of an A-frame ladder instead, but he refused. His sectional ladder also had no rubber feet, and he allowed water to accumulate on the platform.

Gansevoort Market moves for summary judgment and argues that plaintiff's cleaning of the cooling tower was routine, and thus not protected by Labor Law 240 (1). It further argues that this routine cleaning was also not done in the context of construction or renovation work. Even if the section applies, Gansevoort Market argues that plaintiff's actions were the sole proximate cause of the accident.

Plaintiff moves for summary judgment on liability, and argues in opposition, that his work of cleaning the Gansevoort Market's cooling tower at a considerable elevation is protected by Labor Law 240 (1), because cleaning a building structure is covered by the statute. Plaintiff further argues that the City defendants and Gansevoort Market violated such section as owners because they breached their nondelegable duty to furnish plaintiff with safety devices, such as a hook, harness or sling, or other means to tie off his ladder to prevent the elevation-related fall. Further, any negligence by plaintiff, does not defeat his Labor Law 240 (1) claim. Plaintiff also argues that Gansevoort Market fails to raise an issue of fact that plaintiff was recalcitrant.

159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK                    Page 17 of 26
Motion No.  005 006 007

17 of 26

"Labor Law 240 (1), often called the 'scaffold law,' provides that '[a]ll contractors and owners ... shall furnish or erect, or cause to be furnished or erected ... scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to [construction workers employed on the premises'" (*Ross v Curtis-Palmer Hydro-Elec. Co.*, 81 NY2d 494, 499-500 [1993]; *see also Soto v J. Crew Inc.*, 21 NY3d 562, 566 [2013]). The duty imposed by this statute is nondelegable "and that an owner or contractor who breaches that duty may be held liable in damages regardless of whether it actually exercised supervision or control over the work" (*Ross*, 81 NY2d at 500). Labor Law 240 (1) "was designed to prevent those types of accidents in which the scaffold, hoist, stay, ladder or other protective device proved inadequate to shield the injured worker *from harm directly flowing from the application of the force of gravity to an object or person*" (*id.* at 501).

"'Cleaning' is an expressly enumerated activity under the statute . . . [and it] applies to commercial 'cleaning' which is not part of construction, demolition or repair work" (*Rega v Avon Products*, 2014 NY Slip Op 33674[U], *3 [Sup Ct, NY County 2014]; *see also Broggy v Rockefeller Group, Inc.*, 30 AD3d 204 [1st Dept 2007], *aff'd* 8 NY3d 675 [2007] [emphasis added]). The statute does not apply, however, to routine cleaning. Thus, to constitute as cleaning outside of "the sphere of commercial window washing," (*Soto*, 21 NY3d at 568), the Court of Appeals in the *Soto* case held that

> "an activity cannot be characterized as 'cleaning' under the statute, if the task: (1) is routine, in the sense that it is the type of job that occurs on a daily, weekly or other relatively-frequent and recurring basis as part of the ordinary maintenance and care of commercial premises; (2) requires neither specialized equipment or expertise, nor the unusual deployment of labor; (3) generally involves insignificant elevation risks comparable to those inherent in typical domestic or household cleaning; and (4) in light of the core purpose of Labor Law 240 (1) to protect construction workers, is unrelated to any ongoing construction, renovation, painting, alteration or repair project"

(*id.*). "The first factor considers whether the work is 'routine, in the sense that it is the type of job that occurs on a daily, weekly or other relatively-frequent and recurring basis as part of the ordinary maintenance and care of commercial premises'" (*Healy v EST Downtown, LLC*, 38 NY3d 998, 999-1000 [2022] [internal citation omitted]; *see also Fuller v KFG Land I, LLC*, 189 AD3d 666, 678 [1st Dept 2020], quoting *Dos Santos v Consolidated Edison of N.Y., Inc.*, 104 AD3d 606, 607 [1st Dept 2013] ["In determining whether work is considered a 'repair' under Labor Law 240 (1), '[a] factor to be taken into consideration is whether the work in question was occasioned by an isolated event as opposed to a recurring condition'"]). It is for the court to decide whether an activity constitutes "cleaning" after reviewing all the factors, and "[t]he presence or absence of any one is not necessarily dispositive if, viewed in totality, the remaining considerations militate in favor of placing the task in one category or the other" (*Soto*, 21 NY3d at pp. 568-569). "[T]he breadth of the statute's protection has ... been construed to be less wide than its text would indicate" (*Stoneham v Joseph Barsuk, Inc.*, 41 NY3d 217, 222 [2023] [internal quotations marks and citation omitted]).

Although "contributory negligence is not a defense to a Labor Law 240 (1) claim . . . where the plaintiff's actions are the sole proximate cause of the accident," a defendant cannot be held liable (*Saquisili v Harlem Urban Dev. Corp.*, 2024 NY Slip Op 33436[U], *5 [Sup Ct, NY County 2024] [quotation marks and citation omitted]). A defendant can show that plaintiff's actions are the sole proximate cause of the accident by demonstrating that "plaintiff had adequate safety devices available; that he knew both that they were available and that he was expected to use them; that he chose for no good reason not to do so; and that had he not made that choice he would not have been injured" (*Cahill v Triborough Bridge & Tunnel Auth.*, 4 NY3d 35, 40 [2004]).

159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK
Motion No. 005 006 007

Page 19 of 26

[* 19]

Applying the law to the facts at hand, plaintiff was *not engaged* in "cleaning" within the meaning of the scaffold law when he fell from the sectional ladder while cleaning the cooling tower. Although plaintiff's cleaning required specialized equipment such as a pressure washer (*see Mazzarisi v New York Socy. for Relief of Ruptured & Crippled*, 205 AD3d 424, 425 [1st Dept 2022]), the cleaning was routine "and unrelated to any ongoing construction, renovation, painting, alteration or repair project" (*Soto*, 21 NY3d at 569; *see also Sobenis v Harridge House Assoc. of 1984*, 111 AD3d 917, 917 [2d Dept 2013], *lv denied* 24 NY3d 914 [2005] [a plaintiff's work of performing annual servicing of air-conditioning system, which was done at the end of every cooling season to ensure the system worked effectively, was held to be routine maintenance]; *Rega*, 2014 NY Slip Op. 33674[U], *4).

Thus, when viewed in totality, "plaintiff's activity cannot be deemed 'cleaning'" (*Rega*, 2014 NY Slip Op 33674[U], *4). Applying the factors set out in the *Soto* case, plaintiff's cleaning of the cooling tower was on a "recurring basis as part of the ordinary maintenance and care of [Gansevoort Market's] premises'" (*Healy*, 38 NY3d at 1000; *see also Rega*, 2014 NY Slip Op 33674[U], *4). The case record shows that the NYC Department of Health required the cleaning of cooling towers twice a year to prevent the Legionnaire's disease. Jobbagy and Bittner both testified that Gansevoort Market hired US Water to clean the cooling tower to prevent Legionnaire's disease because it is mandated by the City (NYSCEF Doc No. 146 at pp. 13-14, 68, 76; NYSCEF Doc No. 147 at pp. 120-121). And plaintiff testified that cleaning cooling towers is done on a periodic and regular basis to prevent Legionnaire's disease (NYSCEF Doc No. 144 at p. 124). "Labor Law 240 (1) does not apply to work that is incidental to regular maintenance" (*Rega*, 2014 NY Slip Op 33674[U], *4).

159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK                Page 20 of 26
Motion No.  005 006 007

20 of 26

Although plaintiff's cleaning involved an elevation-related risk of 20 feet, plaintiff's cleaning "was unrelated to ongoing construction, renovation, painting, alteration or repair project on the premises" (*Rega*, 2014 NY Slip Op 33674[U], *4). Jobbagy testified that the twice-a-year mandated cleaning was not part of any ongoing project or construction on the premises or the cooling tower (NYSCEF Doc No. 146, pp. 72, 75). Plaintiff also testified that there was no construction at the location at the time of his accident (NYSCEF Doc No. 144 at pp. 41, 141). "Labor Law 240(1) [also] does not apply every time an employee is injured as the result of an elevation differential" (*Stoneham*, 41 NY3d at 221 [internal quotation marks and citation omitted]; *see also Abbatiello v Lancaster Studio Assoc.*, 3 NY3d 46, 53 [2004] [holding that routine maintenance of a malfunctioning cable box is not covered under the statute even though plaintiff fell from a 20 foot ladder while working on the cable box]). In opposition, plaintiff failed to meet his burden or raise a triable issue of fact that Labor Law 240 (1) applies.

Because the court has found that Labor Law 240 (1) does not apply, the court will not address defendants' defenses of recalcitrant worker or that plaintiff's actions were the sole proximate cause of the accident.

For all these reasons, plaintiff's Labor Law 240 (1) claim is dismissed.

B. Labor Law 241 (6)

The City defendants argue that plaintiff's Labor Law 241 (6) claim should be dismissed because plaintiff's cleaning of the cooling tower was routine. Similarly, Gansevoort Market argues that the claim should be dismissed because plaintiff's injuries did not happen during any construction, demolition or excavation work. Gansevoort Market further contends that plaintiff's work was routine and not within the ambit of the statute. Plaintiff does not address these arguments in his responses.

**159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK**
Motion No. 005 006 007

**Page 21 of 26**

21 of 26

[* 21]

"Labor Law 241 (6) imposes on owners, general contractors, and their agents a nondelegable duty to provide reasonable and adequate protection to workers engaged in construction, demolition, and excavation activities by complying with Industrial Code regulations that specify *concrete safety directives*, regardless whether they exercised supervision or control over the work" (*Lapinsky v Extell Dev. Co.*, 202 AD3d 478, 479 [1st Dept 2022] [quotation marks and internal citation omitted, emphasis added]; *see also Rizzuto v L.A. Wenger Contr. Co.*, 91 NY2d 343, 348 [1998]; *Ross*, 81 NY2d at 503-505).

Here, plaintiff does not oppose the City defendants and Gansevoort Market's arguments that his Labor Law 241 (6) claim should be dismissed (NYSCEF Doc No. 228 & 232, plaintiff's memo of law). Plaintiff's Labor Law 241 (6) claim is thus dismissed as abandoned (*see Romano v New York City Tr. Auth.*, 213 AD3d 506, 508 [1st Dept 2023]; *Fundus v Scarola*, 214 AD3d 479, 480 [1st Dept 2023]). Further, protection under this statute is inapplicable outside of the context of construction, demolition, or excavation, and the case record shows that there was no construction, demolition or excavation that was involved with the cooling tower during plaintiff's cleaning (*Rega*, 2014 NY Slip Op 33674[U], *5).

For these reasons, plaintiff's Labor Law 241 (6) claim is dismissed.

C. Labor Law 200 and Common-Law Negligence Claims

In his motion for summary judgment and in opposition to defendants' motions, plaintiff argues that the City defendants violated Labor Law 200 because they did not provide a safe place for plaintiff to work, even though they did not supervise his work. Plaintiff also argues that the City defendants created the dangerous condition of installing a cooling tower without hooks or means to tie off ladders, and they were aware of the dangerous condition because they knew that plaintiff needed a ladder to do the work. Further, plaintiff argues that Gansevoort Market is also liable

because it knew the cooling tower had no hooks or other means to tie the ladders and was aware that the working site was unsafe.

In their motion and opposition, the City defendants argue that Labor Law 200 and negligence claim should be dismissed because the City defendants had no supervisory control over plaintiff's work, did not create the alleged dangerous condition, and had no notice of the alleged dangerous condition because there was no prior notice of the alleged defect. The City defendants also argue that Gansevoort Market owned the cooling tower and had the sole responsibility to maintain it. The City defendants further contend that the tower was manufactured and installed by a separate company, plaintiff's claim is not a products liability claim, and Gansevoort Market's argument that the City defendants were negligent in the installation of the subject cooling tower should be disregarded.

In its summary judgment motion and opposition papers, Gansevoort Market argues that this claim against it should be dismissed because Gansevoort Market did not control the method or manner by which plaintiff did his work, and it did not create the alleged dangerous condition or have notice of it. At minimum, Gansevoort Market argues that there is an issue of fact on whether the City defendants were negligent in installing the subject cooling tower.

Labor Law 200 provides in pertinent part:

> "1. All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons. The board may make rules to carry into effect the provisions of this section"

The statute "codifies owners' and general contractors' common-law duty to provide construction workers with a safe workplace" (*Lapinsky*, 202 AD3d at 479). "In other words, a Labor Law 200

**159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK**                    Page 23 of 26
**Motion No.  005 006 007**

claim is 'tantamount to a common-law negligence claim in a workplace context'" (*Rega*, 2014 NY Slip Op 33674[U], *5 [internal citation omitted]). "Labor Law 200 claims fall into two categories: (1) those involving injuries arising from dangerous or defective premises conditions; and (2) those involving injuries arising from the means or methods in which the work is performed" (*id.*).

When an alleged claim arises out of a dangerous condition on premises, "a defendant will not be liable unless it created the dangerous condition or had both control over the worksite and actual or constructive notice of the condition" (*Lapinsky*, 202 AD3d at 479-480; *see also Rega*, 2014 N.Y. Slip Op. 33674[U] *6). When a worker gets injured "as the result of the manner in which the work is performed, including dangerous or defective equipment, 'the owner … is liable if it actually exercised supervisory control over the injury-producing work'" (*Rega*, 2014 NY Slip Op 33674[U], *6).

"To constitute constructive notice, a defect must be visible and apparent, and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it" (*Gordon v American Museum of Natural History*, 67 NY2d 836, 837 [1986] [internal citations omitted]).

As an initial matter, notwithstanding plaintiff's arguments, there is no evidence that the cooling tower was defective. Although plaintiff argues that the cooling tower had no built-in ladder with hooks or other means to secure a ladder, there is no evidence that such cooling towers are considered defective. Further, Jobbagy testified that Gansevoort Market was not issued any structurally related violations or citations from the state or any local municipality regarding the cooling tower (NYSCEF Doc No. 146 at p. 73). Plaintiff's argument thus falls more squarely with being injured from the manner in which the work was performed.

159714/2018   BERKOWITZ, MARK vs. CITY OF NEW YORK                    Page 24 of 26
Motion No.  005 006 007

24 of 26

There is no evidence that the City defendants or Gansevoort Market "exercised supervisory control over plaintiff's or [Chemical Specifics'] work" (*Rega*, 2014 NY Slip Op 33674[U], *6). Jobbagy testified that Gansevoort Market contracted US Water to clean the cooling tower to prevent Legionnaire's disease (NYSCEF Doc No. 146 at pp. 13, 68). Gansevoort Market, however, did not hire and did not have any contractual relationship with plaintiff's employer, which US Water hired for the cleaning job (*id.* at p. 96). Bittner explained that he went to the premises on the day of the incident to ensure that Chemical Specifics were on site for the cleaning (NYSCEF Doc No. 147 at p. 31). Bittner showed plaintiff and his helper where the cooling tower, the fresh water supply and the electrical outlets were located for the cleaning (*id.* at p. 41). US Water, however, was not to supervise or control plaintiff's cleaning work (*id.* at pp. 114-115). The City defendants were also not involved in any coordination of the cleaning of the cooling tower on the day of the accident (NYSCEF Doc No. 146 at 29, 71-72; NYSCEF Doc No.144 at p. 119). It was Chemical Specifics alone that provided plaintiff with materials and equipment for cleaning the cooling tower (NYSCEF Doc No. 146 at p. 76; NYSCEF Doc No. 147 at pp. 40, 44; NYSCEF Doc No. 148 at pp. 24, 59).

Plaintiff failed to meet his burden of proof for summary judgment or raise an issue of fact that the City defendants or Gansevoort Market "*controlled the manner in which the plaintiff performed his or her work*, i.e., how the injury-producing work was performed" (*Rega*, 2014 NY Slip Op 33674[U], *6 [internal citations omitted]).

For all these reasons, plaintiff's Labor Law 200 and common-law negligence claims against the City defendants and Gansevoort Market are dismissed.

The City defendants asserted cross-claims against Gansevoort Market for contribution, contractual and common-law indemnification and breach of contract for failure to procure

**159714/2018  BERKOWITZ, MARK vs. CITY OF NEW YORK**
**Motion No. 005 006 007**

**Page 25 of 26**

25 of 26

[* 25]

insurance. Because plaintiff's claims against Gansevoort Market[3] and the City defendants are dismissed, all cross-claims asserted against these defendants are also dismissed.

## CONCLUSION and ORDER

Accordingly, it is hereby,

ORDERED that defendants', the City of New York and New York City Economic Development Corporation, motion for summary judgment (motion sequences no. 005) is granted and the complaint is dismissed against said defendants; and it is further

ORDERED that plaintiff Mark Berkowitz's motion for partial summary judgment (motion sequence no. 006) is denied; and it is further

ORDERED that defendant Gansevoort Market, Inc.'s motion for summary judgment (motion sequence no. 007) is granted and the complaint is dismissed against said defendant; and it is further

ORDERED that the Clerk of the Court shall enter judgment in favor of defendants City of New York, New York City Economic Development Corporation, and Gansevoort Market Inc. dismissing the claims and any cross claims made against them in this action.

This constitutes the Decision and Order of the Court.

| 2/24/2026 | | | JAMES G. CLYNES, J.S.C. |
| DATE | | | |

| CHECK ONE: | | CASE DISPOSED | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|
| | | GRANTED | DENIED | X | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

---

[3] The court notes that although Gansevoort Market moves, in the alternative, for contractual indemnity against US Water and Chemical Specifics in its motion for summary judgment, the court already granted US Water and Chemical Specifics' motions for summary judgment to dismiss all claims against them (see NYSCEF, motion sequences 003-004)

**159714/2018 BERKOWITZ, MARK vs. CITY OF NEW YORK** Page 26 of 26
**Motion No. 005 006 007**